

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-24-00045-CV

_____

IN THE INTEREST OF S.G., A CHILD

On Appeal from the 322nd District Court
Tarrant County, Texas
Trial Court No. 322-727880-22

Before Birdwell, Womack, and Wallach, JJ.
Memorandum Opinion by Justice Birdwell

## MEMORANDUM OPINION

In three points, Stuart's[1] mother (Mother) challenges the sufficiency of the evidence to support the trial court's findings that she endangered Stuart and that termination of the parent–child relationship is in his best interest.[2] *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D)–(E), (2). At the request of appellee the Department of Family and Protective Services, we modify the judgment to delete a predicate-conduct-ground finding that is not supported by the evidence. We affirm the judgment as modified.

## Background

Stuart was removed from his parents' care a few weeks after his birth. At the time, his older sibling had also been removed from the home, and the Department had filed a suit affecting the parent–child relationship (SAPCR) for that child. About a month and a half after Stuart's removal from his parents' care, Mother's and Father's parent–child relationships with Stuart's sibling were terminated; in its final judgment in that case, the trial court found that Mother had endangered Stuart's sibling and failed to comply with her court-ordered service plan.[3]

---

[1]We use a pseudonym to protect Stuart's identity. *See* Tex. R. App. P. 9.8(b)(2).

[2]Stuart's father (Father) did not appeal the trial court's judgment terminating his parent–child relationship with Stuart.

[3]We affirmed the trial court's judgment, holding that the evidence was both legally and factually sufficient to support the trial court's findings that Mother had

2

While the SAPCR involving Stuart was pending, Mother and Father failed to make any progress on working their service plans; thus, the Department sought to terminate their parent–child relationships with Stuart. After a bench trial, the trial court found that Mother had endangered Stuart (D & E predicate-conduct grounds), had her rights to another child terminated on endangerment grounds (predicate-conduct ground M), had constructively abandoned Stuart (predicate-conduct ground N), and had failed to comply with the terms of a court-ordered service plan (predicate-conduct ground O). *See id.* § 161.001(b)(1)(D)–(E), (M)–(O). The trial court also found that terminating the parent–child relationship between Mother and Stuart was in his best interest. *Id.* § 161.001(b)(2).

## Discussion

In Mother's first two points, she challenges the legal and factual sufficiency of the evidence to prove that she endangered Stuart according to Family Code Section 161.001(b)(1)(D)–(E). Mother has not challenged the other three predicate-conduct grounds found by the trial court; thus, our review of her first and second points cannot result in a reversal. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003) ("Only one predicate finding . . . is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest."); *In re G.W.*, No. 02-22-00181-CV, 2022 WL 4545568, at *2 (Tex. App.—Fort Worth Sept. 29, 2022, pet.

---

endangered Stuart's older sibling. *See In re M.G.*, No. 02-23-00074-CV, 2023 WL 4008687, at *6 (Tex. App.—Fort Worth June 15, 2023, pet. denied) (mem. op.).

denied) (mem. op.). But when a parent challenges a subsection D or E finding, due process and due course of law demand that we address the finding and detail our analysis. *In re N.G.*, 577 S.W.3d 230, 235 (Tex. 2019). Thus, we will address whether the evidence is legally and factually sufficient to prove the endangerment grounds. *See G.W.*, 2022 WL 4545568, at *2. Because the pertinent facts are interrelated, we will discuss them together.

**Standard of review**

The Department must prove the elements of a suit to terminate a parent–child relationship by clear and convincing evidence, which is evidence that "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. §§ 101.007, 161.001(b); *In re Z.N.*, 602 S.W.3d 541, 545 (Tex. 2020).

To determine whether the evidence is legally sufficient in parental-termination cases, we look at all the evidence in the light most favorable to the challenged finding to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *Z.N.*, 602 S.W.3d at 545. The factfinder may draw inferences, but they must be reasonable and logical. *Id.* We assume that the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.*; *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). That is, we consider evidence favorable to the

4

finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). If we determine that no reasonable factfinder could form a firm belief or conviction that the Department proved the challenged finding, then the evidence is legally insufficient. *J.F.C.*, 96 S.W.3d at 266.

When determining whether the evidence supporting the termination of a parent–child relationship is factually sufficient, we must perform "an exacting review of the entire record." *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the factfinder's findings and do not supplant them with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that the Department proved the challenged finding. Tex. Fam. Code Ann. § 161.001(b); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19.

**Applicable law**

To endanger a child means to expose the child to loss or injury or to jeopardize the child's emotional or physical health. *In re R.R.A.*, No. 22-0978, 2024 WL 1221674, at *6 (Tex. Mar. 22, 2024); *In re G.F.*, No. 02-21-00267-CV, 2022 WL 524138, at *3 (Tex. App.—Fort Worth Feb. 22, 2022, pet. denied) (mem. op.). The difference between endangerment under subsection D and endangerment under subsection E is the source

of the physical or emotional endangerment to the child. *In re R.S.*, No. 02-15-00137-CV, 2015 WL 5770530, at *3 (Tex. App.—Fort Worth Oct. 1, 2015, no pet.) (mem. op.).

Under subsection D, we examine evidence about the child's environment to determine if the environment caused the physical or emotional endangerment. *Id.* But "a parent's conduct can also contribute to an endangering environment" under subsection D when that conduct—including by omission—produces an endangering environment. *In re H.S.*, No. 02-23-00367-CV, 2024 WL 1207304, at *19 (Tex. App.—Fort Worth Mar. 21, 2024, no pet. h.) (mem. op.) (citing *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.)).

Under subsection E, we ask whether evidence shows that the parent's conduct directly resulted in the child's endangerment. *Id.* The behavior must constitute a voluntary, deliberate, and conscious course of conduct but need not be directed at the child; we may infer the specific danger to the child's well-being from the parental misconduct alone. *Id.* Courts may consider conduct that occurred outside the child's presence or after the child's removal by the Department. *In re C.L.-F.*, No. 02-22-00021-CV, 2022 WL 2353091, at *2 (Tex. App.—Fort Worth June 30, 2022, no pet.) (mem. op.). Generally, conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied).

Although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest

6

analysis is child-centered, focusing on the child's well-being, safety, and development, *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). And evidence probative of a subsection (b)(1) ground may also be probative of best interest. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). In reviewing best-interest evidence, we consider nonexclusive factors that the factfinder may apply:

- the child's desires;

- the child's current and future emotional and physical needs;

- the current and future emotional and physical danger to the child;

- the parenting abilities of those seeking custody and programs available to assist them;

- the parties' plans for the child, including the stability of the proposed home or placement;

- the parent's acts or omissions suggesting that the existing parent–child relationship is inappropriate; and

- any excuse for the parent's acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

**Sufficiency of evidence supporting endangerment findings**

**Applicable facts**

Mother received only "limited prenatal care" while pregnant with Stuart. The day after Stuart's birth, the hospital contacted the Department because of "concerns of marijuana smell and use" by Father and because Mother was trying to leave the

hospital against medical advice (AMA).[4] Mother's and Stuart's drug tests at the hospital were negative. The Department allowed Mother and Stuart to go home two days after his birth. The Department investigator assigned to the case began working with Mother and Father and the assigned OCOK[5] worker to obtain drug tests and mental-health evaluations. Father refused to drug test.

A different Department investigator was assigned to a subsequent intake two weeks later because of "concerns of untreated mental health and domestic violence." That investigator initially contacted Stuart's paternal grandmother and Father. Father was uncooperative and aggressive, and he seemed to be under the influence of some substance.

Later the same day, the second investigator contacted Mother and Father at their residence. When the investigator tried to talk about the case, Father became agitated and aggressive, began to bang on the walls, and said that "the Department was trying to

---

[4]The hospital notes indicate that Father became angry and agitated when the doctor tried to explain to him why the baby could not yet be discharged—Mother had tested positive for a communicable disease subject to the confidentiality requirements of Chapter 81 of the Texas Health and Safety Code, and a second test to confirm the first test's validity was not yet complete. Father told the doctor he did not want the Department involved and did not want them to take his baby again. The hospital notes also indicate that Mother breastfed Stuart three times at the hospital despite having been advised not to do so.

[5]OCOK, an acronym for Our Community Our Kids, "is a private provider of community-based care that contracts with the Department" in Tarrant County and other Texas counties and provides "foster care case management, kinship, and family reunification services." *In re M.M.*, No. 02-21-00153-CV, 2021 WL 4898665, at *2 n.4 (Tex. App.—Fort Worth Oct. 21, 2021, pets. denied) (mem. op.).

take his child again." Father again refused to give an oral swab for a drug test. Mother told the investigator that Father "had put her and the child outside of the home when it was cold outside, and she didn't have proper clothing for the child."[6] Mother also told the investigator "that she had schizophrenia but was not taking any medication."

The Department had previously removed another child from Mother's and Father's care,[7] and Father "had [an] extensive criminal history involving drug usage and domestic violence."[8] In light of the Department's concerns—and because no suitable family member could come live in the house with Mother and Father or take care of Stuart elsewhere—Stuart was removed from Mother's and Father's care. Stuart was placed in an adoption-motivated home with his biological sibling.

The OCOK worker initially assigned to Stuart's case testified that the Department continued to have safety concerns about Mother's and Father's "not complying with mental health evaluations in order to understand their current mental health state" and about Father's drug use in light of his unwillingness to submit to testing. Although Father and Mother both refused drug tests, Father's drug use was

---

[6]At trial, Mother denied that this incident happened, saying she "was inside the house the whole time with" Stuart.

[7]The Department entered into evidence the February 17, 2023 order terminating the parent–child relationship between that child and Mother on endangerment grounds. But the case with that child was still pending when Stuart was removed.

[8]Copies of Father's prior convictions for assaults against family members and for various drug offenses were admitted into evidence.

OCOK's main concern. According to the OCOK worker, Father appeared to be under the influence of drugs during the termination trial for Stuart's older sibling.

Father and Mother refused to meet with the OCOK worker to sign the court-ordered service plans.[9] Mother initially agreed to take parenting classes but then she never started them; neither she nor Father made any progress toward their service-plan requirements. Mother had trouble with transportation, so OCOK gave her cab vouchers and tried to set up virtual services. But Mother refused to engage in virtual services.

Mother and Father never allowed the OCOK worker to inspect their apartment, never showed proof of employment,[10] and never showed the OCOK worker any other proof that they could provide Stuart with a stable living environment. Nevertheless, until June 30, 2023, Mother and Father attended most of their visits with Stuart, and they visited him together.

An OCOK permanency specialist who was assigned to the case in July 2023 was able to go over the service plan with Mother at that time. The permanency specialist testified that Mother told her falsely that she had already worked the required services in the case with Stuart's older sibling; thus, she refused to work the services on her plan related to Stuart. As with the OCOK caseworker, the

---

[9]The OCOK worker mailed the service plan to Mother via certified mail, and it was not returned.

[10]Mother provided the OCOK worker with proof of her social-security income, which she said she received "due to mental health concerns." No evidence was presented about the amount of social-security income Mother received per month.

permanency specialist could not get Mother to comply with her service plan, despite providing referrals and transportation and—when necessary—arranging virtual visits.

In September 2023, Mother's and Father's visits were decreased to one hour in length and moved to a different office with "heightened security" because "[t]he aggression and erratic behavior of both parents increased in an office that didn't have cameras or a security guard." Father "got physically aggressive with the monitor during one of the visits."[11] The police were called during multiple visits because of Father's behavior. Mother "tried to leave with" Stuart during some of the visits. During the visits, Father engaged in most of the interaction with Stuart and "guided [Mother] a lot" in feeding and interacting with Stuart. Stuart was on a special diet, which Mother did not seem to recognize in trying to mix his formula; also, the parents tried to feed Stuart a Snickers bar and had to be asked to leave the visit because of their reaction when told not to. Father smelled of marijuana at the visits.

In addition to modifying the terms of Mother's and Father's visits with Stuart, the Department decided not to allow the permanency specialist to visit Mother and

---

[11]Specifically, Father "became upset with something that the observer said to him, and the visit ended early. And he was asked to leave, and he got chest to chest with the observer in a threatening way asking her what she was going to do."

Father's home because Father had acted aggressively toward her when she dropped off cab vouchers for Mother.[12]

Mother testified and claimed that she never followed through on "an evaluation" because although she dropped off paperwork, no one ever called her back. According to Mother, she never attended classes because the Department did not tell her about them timely. Mother also denied giving Stuart a Snickers bar, claimed that she never engaged in aggressive behavior at visits, and said that she took Stuart out of the room whenever Father behaved aggressively at visits.

**Analysis**

Mother contends that the evidence is both legally and factually insufficient to support the trial court's endangerment findings, pointing to what she argues is a lack of justification for the initial removal and a host of missing supporting facts, such as the lack of evidence that she used drugs, abused Stuart, or knew about Father's extensive drug-related and domestic-violence-related criminal history.

Suspected drug use by Mother was not the initial concern that brought Stuart into the Department's care. And the medical records admitted into evidence showed that at the hospital, Mother ignored the hospital staff's instructions and breastfed Stuart despite her positive test for a communicable disease. Mother also allowed Father to be in her hospital room while he appeared to be high, smelled of marijuana,

---

[12]On cross-examination, the permanency specialist answered, "No, I didn't," when asked, "And when you visited [Mother] at the home, did you ask to come into the home?"

and was acting aggressively, and she acquiesced to his desire to leave the hospital AMA[13] before the hospital could confirm whether she had a communicable disease (and therefore had exposed Stuart to it).[14]

Mother continued to live with Father despite his refusal to take court-ordered drug tests, and she arrived at visits with Father while he smelled of marijuana. *See, e.g., M.R. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-23-00510-CV, 2024 WL 589907, at *13 (Tex. App.—Austin Feb. 14, 2024, no pet. h.) (mem. op.) (noting in endangerment analysis that trial court could have reasonably inferred from evidence that father knew of mother's drug use and that his inaction contributed to child's endangering environment). Father was convicted of assault against a family member (with a prior related conviction) and sentenced to two years' confinement beginning February 2, 2022—after the birth of Stuart's older sibling but before Stuart's conception. Thus, the trial court could have reasonably inferred that Mother knew of at least one instance of Father's incarceration.

The trial court was entitled to believe that Mother had refused to work services that the Department had attempted adequately to facilitate for her. *See In re J.P.H.*, No. 04-23-00131-CV, 2023 WL 5280376, at *6 (Tex. App.—San Antonio Aug. 16, 2023, pet. denied) (mem. op.) ("The trial court was entitled to view [the m]other's lack of

---

[13]The hospital records indicate that Mother and Father "tried to leave AMA but stayed after finding out CPS would be notified."

[14]Stuart was prescribed a preventative antiviral drug at the hospital.

cooperation with the Department as an unwillingness to effect positive environmental and personal change."); *In re K.P.C.*, No. 14-17-00993-CV, 2018 WL 2106669, at *12 (Tex. App.—Houston [14th Dist.] May 8, 2018, pet. denied) (mem. op.) (noting that a court may consider a parent's failure to complete a service plan as part of an endangering-conduct analysis). Mother did not appear to resist Father's denial of the appropriateness of the Department's involvement, and she was also uncooperative in spite of the fact that she had a case pending with another child.[15] *In re G.G.-H.*, No. 05-23-00437-CV, 2023 WL 6225410, at *2 (Tex. App.—Dallas Sept. 22, 2023, no pet.) (mem. op.) (noting that a parent's failure to cooperate with the Department can qualify as endangering conduct); *In re S.A.L.*, No. 13-23-00045-CV, 2023 WL 3879856, at *9 (Tex. App.—Corpus Christi–Edinburg June 8, 2023, pet. denied) (mem. op.) ("[The m]other's unwillingness to cooperate with the Department because she 'disagree[s] with what they're saying[]' demonstrates her own developmental immaturity, indicating an inability to prioritize reunification with S.L. and effect personal change for the betterment of her child."). In other words, Mother never showed that she understood why the Department was involved with the family in the

---

[15]Mother asserts in her brief that "[t]he Department sought [her] assistance in building a case against her [and that s]he declined the government's offer." Inasmuch as Mother seeks to assert that her lack of cooperation with the Department was merely neutral because she simply chose not to create a situation where the Department could obtain evidence against her, we decline to view it that way. A fit parent adequately cares for a child, *Troxel v. Granville*, 530 U.S. 57, 68, 120 S. Ct. 2054, 2061 (2000), regardless of that parent's personal interest.

first place and, thus, that she wanted to, or was likely to be able to, make changes to provide Stuart with a safe and stable environment.[16]

Finally, Mother was not taking medication for her schizophrenia when Stuart was born, did not indicate that she had plans for getting back on that medication, started acting more erratically as the case with Stuart continued,[17] and was pregnant again at the time of trial (from which the trial court could have reasonably inferred that Mother likely would or already had discontinued taking her medication if she had begun taking it again after Stuart's removal). *See In re A.L.H.*, 515 S.W.3d 60, 91 (Tex. App.—Houston [14th Dist.] 2017, pet. denied) (noting that untreated mental illness can expose a child to endangerment).

---

[16]Mother argues that the caseworker's testimony that she hadn't shown she could provide Stuart with a safe and stable environment "improperly reversed the burden of proof." We cannot pluck this testimony out of the context of the entire record. Mother has not challenged the trial court's O finding, nor did she challenge its constitutionality in the trial court. Mother's refusal to cooperate with the Department or her court-ordered service plan in any context other than to attend visits with Stuart was highly relevant to whether she could provide him with a safe and stable environment and cannot be separated from other evidence relevant to this point, such as her continued attachment to Father despite the evidence of his drug use and aggressive behavior; her lack of understanding of the importance of the medical advice given to her upon Stuart's birth—that had the potential to directly impact his health and safety; and her apparent lack of desire to learn or improve her parenting skills even in the face of a pending and then final termination of her parent–child relationship with Stuart's older sibling.

[17]Mother notes in her brief that she was not appointed counsel until August 28, 2023. But the evidence shows that the appointment of counsel did not result in any change in Mother's progress toward completing her service plan or in her increased cooperation in the case. In fact, Mother's and Father's visits with Stuart were curtailed in September 2023 due to concerns with both Father and Mother.

Mother's argument on appeal challenges the appropriateness of the original removal[18] and focuses on what evidence is missing from the record.[19] But our focus is on the evidence that was presented to the trial court and whether that evidence was sufficient to prove endangerment.

Mother also discounts the Department investigator's testimony that Mother admitted Father left her outside with Stuart on a cold night because (a) Mother denied at trial that it happened, (b) Mother testified about the event during the termination trial concerning Stuart's older sibling, and (c) it gives rise only to an inference of possible domestic violence against Stuart but not Mother. First, the trial court was entitled to disbelieve Mother's denials of the Department's evidence. *See In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009). Second, that Mother testified about the incident at a previous trial—which took place after Stuart's birth and removal—does not mean that the occurrence is not relevant to Stuart. Mother's inability or unwillingness to

---

[18]Any complaint about the initial removal order—including Mother's unpreserved constitutional complaints about unreasonable search and seizure—is now moot and therefore not subject to review on appeal. *See In re E.S.*, No. 02-20-00407-CV, 2021 WL 2149627, at *12 (Tex. App.—Fort Worth May 27, 2021, pet. denied) (mem. op.).

[19]Mother argues that there is no evidence she knew of Father's drug use, but the record shows several instances when Mother was present with Father while he smelled so strongly of marijuana that others noticed the odor.

protect Stuart (or his sibling) against such conduct by Father is relevant to an endangerment analysis.[20] *See, e.g.*, *R.S.*, 2015 WL 5770530, at *6.

We conclude that the quantum of evidence is both legally and factually sufficient to support the trial court's findings under subsections D and E of Family Code Section 161.001(b)(1). We overrule Mother's first and second issues.

**Sufficiency of evidence supporting best-interest finding**

In her third issue, Mother challenges the factual sufficiency of the evidence to support the trial court's finding that termination of the parent–child relationship is in Stuart's best interest. We organize our discussion of this issue within the framework of the *Holley* factors.

- **Second *Holley* factor (Stuart's current and future emotional and physical needs)**[21]: Stuart did not have any significant health concerns when he was placed in foster care because Mother and Father had taken him to his newborn pediatrician appointments. Thereafter, the foster family took Stuart to his scheduled pediatric appointments. Stuart was evaluated by Early Childhood Intervention, but he had been recently discharged at the time of trial; he "was gaining more weight and [was] just more healthy."

- **Third and sixth *Holley* factors (current and future emotional and physical danger to Stuart and parent's acts or omissions suggesting parent–child relationship improper)**: We need not reiterate the endangerment evidence previously reviewed. Neither Mother nor Father—who were still living together—had taken any steps to mitigate the concerns that

---

[20]Mother contends that she showed at least one instance of protective behavior—when Father became aggressive at a visit, she took Stuart out of the room. Not only was the trial court entitled not to believe Mother, but also this testimony was in the context of Mother's denial about her own allegedly improper conduct at visitations. Thus, we need not consider it to be in Mother's favor.

[21]Stuart was not old enough to express any placement desire (first *Holley* factor).

brought Stuart into the Department's care, taking the position that they did not have to do so. The OCOK worker believed that termination was in Stuart's best interest because Mother and Father made no progress on their service plans, had not demonstrated that they could provide a safe and stable environment for a child, and continued to indicate mental-health and drug-abuse problems. The permanency specialist echoed the concerns of the OCOK worker—she believed the termination was in Stuart's best interest because Mother and Father had not shown the ability to care for him or themselves, had not made any progress on their service plans, and had not shown the ability to provide a safe or stable environment for Stuart.

• **Fourth and fifth** *Holley* **factors (parenting abilities of those seeking custody and programs available to them; parties' plans for child)**: OCOK attempted to find family members who could care for Stuart, but they declined. Mother was pregnant again at the time of trial. She testified that although she had her "own place," Father was still living with her. She also refused to give her address. Stuart was doing well in the foster family's care and was bonded to them; they were able to meet his physical, emotional, and financial needs, and they provided him with a loving, safe, structured, and stable environment where he was thriving. The foster parents planned to adopt Stuart and his older sibling. The family would be eligible to receive post-adoption services from the Department, including counseling and evaluations, if necessary.

• **Seventh** *Holley* **factor (any excuse for parent's acts or omissions)**: Mother argues that her refusal to work services was justified because she had already worked them in the case with Stuart's older sibling and because "[t]he Department sought [her] assistance in building a case against her." But the evidence showed that Mother's assertion that she had worked services in the prior case was untruthful. Additionally, the trial court did not have to believe evidence from Father as to why he and Mother were uncooperative with the Department. Father testified in narrative form and said that the Department witnesses were lying and that he had no faith in the system. He said that he had never abused Stuart and that he and Mother had taken good care of Stuart in the three weeks he was in their custody. According to Father, the Department had "no evidence to . . . support the[] claim. It's just hearsay. It's just stuff that they're making up."

According to Mother, "[t]here was a great deal of evidence . . . that pointed to [her] potential to provide for her child's best interest." She lists specifically (1) that she

and Stuart were drug free at birth; (2) that no evidence showed that she had a history of abusing illegal drugs, had a criminal record, or abused Stuart at the hospital or after their release; (3) that she had a stable source of income from social-security disability; (4) that at the time of trial, she had leased an apartment in her name; (5) that she regularly attended visits with Stuart; (6) that no evidence showed that her schizophrenia impacted her parenting abilities; and (7) that the Department did not challenge her testimony that mental-health providers failed to follow up with her after she initially contacted them.[22]

Again, Mother focuses on what evidence is not in the record versus what evidence is in the record. The Department could not evaluate the suitability of Mother's home because she never cooperated with attempts to observe her living conditions. She obstreperously refused to cooperate with efforts to provide her services to alleviate the concerns that had brought Stuart and his older sibling into the Department's care.[23] She either failed to appreciate the potential impact of Father's

---

[22]Mother cites her own testimony given after the Department rested its case. She claimed to have dropped off paperwork for "an evaluation" but said that she never completed "that test" because "[s]he never called me back." Not only is it unclear what evaluation Mother was referencing or who never called her back, the trial court was entitled to disbelieve Mother, and the Department's witnesses had already testified that Mother wholly failed to not only complete, but also to initiate, services required by her court-ordered plan. That opposing counsel declined to cross-examine Mother about this particular testimony does not mean that—in the context of the entire record—the trial court had to believe it.

[23]As we have pointed out in a prior case, Mother's argument taking issue with general problems in the Texas foster-care system has no bearing on the specific facts

drug use and aggressive behavior on Stuart or refused to consider it a problem in the first place. *See In re A.H.*, No. 02-23-00348-CV, 2024 WL 191229, at *6 (Tex. App.—Fort Worth Jan. 18, 2024, pet. denied) (mem. op.) ("[T]he factfinder could have found that the continued relationship demonstrated Mother's inability to perceive the danger of parental drug use."). The Department could find no family support structure to help Mother care for Stuart and his older sibling. The foster family had been able to provide this structure and stability, and Stuart would have the benefit of not being separated from his sibling.

In light of the evidence pertinent to all of the *Holley* factors, they weigh in favor of termination's being in Stuart's best interest; thus, this evidence is factually sufficient to support the trial court's best-interest finding. We overrule Mother's third point.

## Conclusion

Because the Department concedes that no evidence supports the predicate-conduct finding under Family Code Section 161.001(b)(1)(N), we modify the judgment to delete that predicate-conduct ground only. But having overruled Mother's three points, we affirm the remainder of the trial court's judgment as modified.

/s/ Wade Birdwell
Wade Birdwell
Justice

Delivered: April 25, 2024

---

of this case and the application of the required Family Code elements to those particular facts. *See In re A.H.*, No. 02-23-00348-CV, 2024 WL 191229, at *7 (Tex. App.—Fort Worth Jan. 18, 2024, pet. denied) (mem. op.).